IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **JEREMY PETERS AND KENNETH WINSLOW** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 3:18-cv-00564** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **METROPOLITAN GOVERNMENT OF** | ) | **MAGISTRATE JUDGE NEWBERN** |
| **NASHVILLE AND DAVIDSON** | ) | |
| **COUNTY, TENNESSEE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the Court is a motion for summary judgment filed by Defendant Metropolitan Government of Nashville and Davidson County ("Metro") (Doc. No. 177). In support of the motion, Metro filed a memorandum of law (Doc. No. 178) and statement of undisputed material facts (Doc. No. 179). Plaintiffs Jeremy Peters and Kenneth Winslow responded to the motion (Doc. No. 183) and the statement of facts (Doc. No. 184), and filed a statement of additional disputed facts (Doc. No. 185). Metro filed a reply (Doc. No. 188) and responded to Plaintiffs' statement of facts (Doc. No. 189).

For the reasons stated herein, Defendant's motion for summary judgment (Doc. No. 177) will be **GRANTED**.

## I.       BACKGROUND

The Bridgestone Arena is an entertainment venue owned by the Sports Authority of the Metropolitan Government of Nashville and Davidson County ("Sports Authority"). The Arena was constructed in 1997 to house Nashville's professional hockey team, the Nashville Predators and to present "cultural, educational, entertainment, business, sporting, social and other public

events." (*See* Management Agreement (2012), Doc. No. 179-1 at PageID# 2037, 2050). The Bridgestone Arena property includes the building and outdoor plaza areas adjacent to the building (collectively, the "Arena"). (Def. SOF at ¶ 10). It undisputed that the Arena has commercial purposes. (*Id*. ¶ 18).

Powers Management LLC ("Powers") has managed and operated the Arena since at least 2002.[1] (Def. SOF ¶¶ 1, 11; Powers Decl., Doc. No. 179-5 at ¶ 5). In furtherance of these management responsibilities, Powers implemented policies and procedures regarding use of the Arena (the "Arena Policies"), including policies prohibiting the use of any "noise/voice amplification device," and distribution of "flyers, pamphlets, leaflets, [and] brochures" without express written consent from the Arena.[2]

At issue here is the application of these policies to the main outdoor plaza (the "Plaza"). Individuals and entities leasing the Arena facilities have the full use of the Arena, including the Plaza, and may permit sponsors, performers, or vendors to use portions of the Plaza for purposes of promoting or selling merchandise or other materials, advertising, or conducting activities in

---

[1]     The Second Amended and Restated Operating Management Agreement ("Management Agreement") between Powers and the Sports Authority grants Powers "the exclusive right to operate and manage the Arena" from July 1, 2012, until July 1, 2019. (*See* Management Agreement, Doc. No. 179-1). The Management Agreement was in effect until the execution of a Lease Agreement between the Sports Authority and Powers dated July 1, 2019. (*See* Lease Agreement, Doc. No. 179-2). The Lease Agreement "leases to Powers … the Premises for the purpose of managing and operating the Arena owned by the Authority." (*Id*.).

[2]     The Management Agreement and the Lease Agreement authorized Powers to "[i]mpose and enforce such rules and regulations governing the use of the Arena as [Powers] deems necessary from time to time (acting reasonably and subject to prior consultation with the Sports Authority with respect thereto) to ensure that the Arena is used in a manner consistent with the terms of this Agreement." (Doc. Nos. 179-1, 179-2).

        The same Arena Policies were in effect at all times relevant to the claims in this case. (Def. SOF ¶ 12). Although some of the Arena Policies were amended in March 2018, no substantive changes were made to the policies at issue.

connection with the event. (Def. SOF ¶¶ 20-22). In addition to these activities, the Plaza is used for entry and exit to the Arena building and as a security screening area. (*Id.*).

During events, Powers sets up bicycle racks to delineate the Plaza area from the public sidewalk. (*Id.* ¶¶ 29, 30). When events are not being held, the Plaza serves as a public throughfare, no barricades are in place to physically delineate the Plaza area from the adjacent public sidewalks, and the surface of the Plaza is physically indistinguishable from the surrounding sidewalks. (Pl. SOF ¶¶ 26-27).

During events, Powers utilizes a security team that includes private security and Metro Nashville Police Department ("MNPD") officers. Powers and MNPD have agreed on a protocol to address violations of Arena Policies pursuant to which someone from Powers or its designee is responsible for addressing the violation with the individual and presenting them with the choice of discontinuing the violation or leaving the property. (*Id.* ¶¶ 42-43). If the individual refuses either option, Powers can enlist the assistance of MNPD officers and may opt to prosecute that person for trespassing. (*Id.* ¶ 44). MNPD officers do not proactively enforce Arena Policies, but they may advise individuals that they may be subject to criminal liability for trespass if they do not discontinue the conduct or relocate to an area outside the Plaza. (*Id.* ¶ 45). MNPD officers have never arrested anyone for violation of the Arena Policies or for trespass. (*Id.* ¶¶ 47-48).

On more than one occasion in 2017 and 2018 when the Arena was being used for events, Plaintiffs Jeremy Peters and Kenneth Winslow went to the Arena Plaza to share their religious messages with event attendees using voice amplification and, at times, distributing religious literature. (*See* Declarations of Powers and Winslow, Doc. Nos. 185-1, 185-2). When their conduct violated the Arena Policies, they were asked to either cease the conduct or leave the

Plaza. (*Id*.). Plaintiffs were advised that if they did not do so they would be arrested for trespassing. (*Id*.). Plaintiffs were never arrested, but they claim the threat of arrest caused them to leave the Plaza and stand behind the bicycle racks at the perimeter of the Plaza. (*Id*.). They claim this distance from event attendees prevented them from effectively communicating their message with their intended audience. (*Id*.).

Both Plaintiffs bring facial challenges to the Arena Policies on amplification and leafletting.[3] Peters also challenges the Arena Policies as applied to him on four specific occasions: November 8, 2017 (CMA Awards), December 31, 2017 (New Years' Eve event), February 2, 2018 (CCM Winter Jam), and June 6, 2018 (CMA Festival).[4]

## A. November 8, 2017

On November 8, 2017, the Arena was hosting the Country Music Association ("CMA") Awards. Peters and Winslow were preaching in the Plaza using an amplification device. Peters "was threatened with arrest for trespassing if [he] did not move off the plaza" while he was preaching with an amplification device inside the barricades erected around the Plaza. (*Id*. ¶ 54). Peters continued to preach in the Plaza and eventually left the area of his own accord. (*Id*. ¶ 55). Peters and Winslow claim that the threat of arrest caused them to "preach[] in fear" and to leave

---

[3]     The Amended Complaint also raises a facial challenge to the Arena Policy on handheld signs. (Doc. No. 80 ¶¶ 34-37). The specific policy challenged in the Amended Complaint banned handheld signs that are "distasteful in nature or content." (*Id*.). This policy was amended in October 2020 and is no longer in effect. (Def. SOF ¶¶ 35, 36). Accordingly, Plaintiffs' facial challenge to the pre-2020 sign policy is moot.

[4]     Although Peters and Winslow were together and engaging in similar activities on most of these dates (Winslow was not present on December 31, 2018), Winslow does not allege violations of his constitutional rights on any of these dates. (*See* Amended Complaint, Doc. No. 80). Winslow's claims related to distribution of literature in the Plaza during PredsFest on September 29, 2019, were dismissed. (*See* Memorandum and Order, Doc. Nos. 147, 148). Accordingly, Winslow's remaining claims are facial challenges to the Arena Policies.

4

sooner than they otherwise would have.[5] (*Id.*; *see also*, Winslow Decl., Doc. No. 185-2 at ¶ 4). Peters posted a video of this interaction to his YouTube account.[6] (*Id.* ¶ 53).

### B. December 31, 2017

On December 31, 2017, the Arena was hosting a New Years' Eve event. (Pl. SOF ¶ 6). Peters was in the Plaza, inside the barricades, preaching through a voice amplification device when an MNPD officer informed him that he could continue to preach in the Plaza, but could not do so with amplification. (*Id.* ¶¶ 59-61). Peters posted a video of this interaction to his YouTube account.[7] (*Id.* ¶ 57).

### C. February 2, 2018

On February 2, 2018, the Arena was hosting CCM Winter Jam. Peters was outside the Plaza on the public sidewalks preaching with a voice amplification device. (*Id.* ¶ 64). He was not threatened with arrest, told to stop using his amplifier, or otherwise prevented from preaching on that date. (*Id.* ¶ 65). While Peters was preaching from the public sidewalk, Winslow was in the

---

[5]     Defendant objects that Winslow's Declaration contradicts his deposition testimony during which he stated that he could not remember if anyone asked him to leave or move from where he was preaching and that he was able to exercise his freedom of speech that day and was not restricted from expressing his message in any way. (Winslow Dep., Def. Ex. K at 99, 105). Because these statements may reflect a lapse in memory and do not directly contradict the Declaration, the Court will, as it must, construe the facts in the light most favorable to the non-moving party and presume, for purposes of this motion, that Winslow was threatened with arrest. The Court notes that Winslow does not identify who made the threat. (*See* Winslow Decl., Doc. No. 185-2 at ¶ 4 ("I was told I had to leave the Plaza, and that if I did not, I would be arrested.")).

[6]     The parties agree the video was posted at https://www.youtube.com/watch?v=2WkQOS YuC0. (See Def. SOF ¶ 53). The video is not currently available at that URL.

[7]     The video is available online at https://www.youtube.com/watch?v=VJpTt3ZI51s (last visited Aug. 12, 2024).

5

Plaza distributing Gospel literature.[8] (Pl. SOF ¶ 17). An MNPD officer told Winslow that if he did not stop handing out literature, he would be arrested. (*Id.*). Winslow opted to stop distributing literature. (*Id.*).

### D. June 6, 2018

On June 6, 2018, the 2018 Country Music Television ("CMT") awards show was held at the Arena. (*Id.* ¶ 67). Fifth Avenue, which runs adjacent to the Plaza, was partially closed and barricaded off, pursuant to a permit issued by Metro to the CMA. (*Id.* ¶¶ 68, 70). Peters and Winslow claim to have observed the barricades encroaching on the public sidewalk. (Winslow Decl., Doc. No. 185-2 ¶ 17). As during the other events, Peters and Winslow were outside the Arena to share their religious message with event attendees using a voice amplification device. (Winslow Decl., Doc. No. 185-2 ¶ 11; Peters Decl., Doc. No. 185-1 ¶ 20; Def. SOF ¶ 71). Peters and Winslow claim they were told that they would be arrested if they did not leave the Plaza and the sidewalk. (Peters Decl., Doc. No. 185-1 ¶ 22; Winslow Decl., Doc. No. 185-2 ¶ 13).

The video of the interactions that Peters posted to his YouTube account provides additional detail.[9] (*See* Def. SOF ¶ 66). The video shows that Peters was preaching on the public sidewalk area between the barricades set up on the Plaza and Fifth Avenue when he was informed by a white male in a black t-shirt that he could not be in that area. (*Id.* ¶ 72-73 (citing video at 4:36-5:00)). The parties agree this person was not employed by Powers and was not wearing a police uniform. (*Id.* (citing video at 4:36-5:00 and Powers Decl. ¶ 34)).

---

[8]     Defendant again objects that Winslow's Declaration contradicts his deposition testimony during which he stated that he did not remember whether he had any interactions with MNPD on that date. (Winslow Dep., Def. Ex. K at 117). As stated above, Winslow's present recollection of the events does not directly contradict his deposition testimony.

[9]     The video is available online at https://www.youtube.com/watch?v=ZQJWJLOoEWs (last visited Aug. 12, 2024).

The video also shows Peters preaching in the Plaza using a voice amplification device when he was informed by one or more uniformed police officer(s), who were not MNPD officers, that he needed to move to the public sidewalks on the north side of the Plaza near Broadway or to the other side of the barricades set up on Fifth Avenue. (Def. SOF ¶ 76 (citing video at 5:54-7:20)). After receiving that warning, Peters and/or Winslow asked what would happen if they continued to preach in the Plaza, at which time they were informed by a police officer employed by the City of Goodlettsville that they could be arrested for criminal trespassing. (*Id*. ¶ 75). After being advised that they could be arrested for trespass, Peters moved to the south end of the Plaza, outside of the barricades, where he resumed preaching. (*Id*. ¶ 77 (citing Peters Dep. at 135)). Peters later resumed preaching inside the Plaza without further threat of arrest. (*Id*. ¶ 78 (citing Peters Dep. at 135-36)).

## II.      ANALYSIS

### A.  Section 1983

Plaintiffs bring this case under 42 U.S.C. § 1983, which provides a mechanism for civil claims for violation of a federal right by a person acting under color of law. *See Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006). Municipalities and local governments "cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. N.Y.C. Dept. of Social Servs*., 436 U.S. 658, 691 (1978). Plaintiffs must show that the municipality of local government itself is responsible for the alleged civil rights violation through either its adoption or enforcement of an official policy or a custom "so widespread as to have the force of law." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997). Thus, in order to sustain a constitutional claim against a municipality or local government, a plaintiff must prove, "(1) that a violation of a

7

federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen." *Bright v. Gallia Cty.*, 753 F.3d 639, 660 (6th Cir. 2014). The plaintiff must "identify the policy, connect the policy to the [municipality] itself and show the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

Plaintiffs contend Metro is subject to municipal liability for the alleged constitutional violations on various theories, including that Metro adopted the Arena Policies. The parties are, of course, not in agreement on this issue. Metro contends the Arena Policies are not a "government action" because the Arena is privately operated and managed by Powers and the Arena Policies were created and implemented by Powers, a private entity, as part of its operations and management obligations. (Doc. No. 178 at 8-12). Plaintiffs disagree. They argue that even if Powers manages and operates the property, Metro cannot "hide behind Powers" and "abdicat[e] its responsibility to protect the constitutional rights of its citizens in public fora." (Doc. No. 183 at 9). Plaintiffs also dispute Metro's contention that it had no role in developing the Arena Policies. Plaintiffs point to provisions in the Management Agreement and Lease Agreement that authorize Powers to develop regulations "subject to prior consultation with the [Sports] Authority." (*Id*. at 5 (citing Management Agreement, Doc. No. 179-1 at PageID# 2053; Lease Agreement, Doc. No. 179-2 at PageID# 2122)).

For reasons explained below, the Court finds the Arena Policies survive constitutional scrutiny. Accordingly, the Court need not decide whether the Policies are, in fact, attributable to Metro. Therefore, for purposes of this motion, the Court assumes, without deciding, that the Arena Policies are a government regulation on speech.

8

### B. First Amendment[10]

The Free Speech Clause of the First Amendment, which is applicable to state and local governments through the Fourteenth Amendment, limits the government's power to regulate speech on public property. Const., Amend. I.; *Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 485 (6th Cir. 2020); *Sisters for Life, Inc. v. Louisville-Jefferson Cty.*, 56 F.4th 400, 403 (6th Cir. 2022).

"[W]hen a plaintiff alleges that government action has interfered with protected speech, to determine whether a First Amendment violation has occurred, the court must evaluate: (1) whether the speech at issue is protected; (2) the nature of the forum in which the speech occurred; and (3) whether the government's action is justified under the requisite standard." *New Century Foundation v. Robertson*, 400 F. Supp. 3d 684 (M.D. Tenn. 2019) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985), and *Bible Believers v. Wayne Cty., Mich.,* 805 F.3d 228, 242 (6th Cir. 2015)).

There is no dispute that Plaintiffs' amplified preaching and leafletting fall within the scope of speech protected by the First Amendment. At issue is the nature of the forum and whether the Arena Policies are justified under the requisite standard. The Court begins with the nature of the forum, which determines the standard under which the Court considers whether the restrictions are justified. *See Ison v. Madison Loc. Sch. Dist. Bd. of Ed.*, 3 F.4th 887, 893 (6th

---

[10] Plaintiffs' claims are based on alleged violations of their First Amendment rights to free speech and free exercise of religion. (*See* Amended Complaint, Doc. No. 80). Plaintiffs agree that their free speech and free exercise claims which are "pursued in tandem and involve the same conduct, religious speech," may be considered together. (Doc. No. 183 at 30 (citing *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 256 (6th Cir. 2015) (en banc)). Accordingly, the analysis and disposition of the free speech claim applies equally to the free exercise claim.

Cir. 2021) ("The strength of the First Amendment protection, and the level of justification required for a speech restriction, varies depending on the forum where the speech occurs.").

    1.   <u>The Nature of the Forum</u>

"The Supreme Court has recognized three types of public fora: the traditional public forum, the designated public forum, and the limited public forum." *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010) (citing *Pleasant Grove v. Summum*, 555 U.S. 460 (2009)). "A nonpublic forum, in contrast, is a government-owned property that is not by tradition or governmental designation 'a forum for public communication.'" *Id*. (citing *Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir. 2007)).

A traditional public forum is a type of property that has traditionally been available for public expression. The quintessential examples of traditional public fora are streets, sidewalks, and public parks, because as "the Supreme Court has explained that from '[t]ime out of mind public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum.'" *United Church of Christ*, 383 F.3d at 452 (quoting *Frisby v. Schultz*, 487 U.S. 474, 480 (1988)); *see also*, *Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 45 (1983) (explaining that streets and parks "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions" and are therefore traditional public fora).

A designated public forum is created when a government intentionally opens a nontraditional public forum for public discourse. *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010) (citing *Cornelius v. NAACP Legal Defense & Educ. Fund Inc.*, 473 U.S. 788, 802

10

(1985)). "Governmental intent is the 'touchstone' of a court's analysis in determining whether it has created a public forum." *Id*. (citing *Kincaid v. Gibson*, 236 F.3d 342, 348-49 (6th Cir. 2001)). To determine governmental intent, courts 'look to the government's policy and practice with respect to the forum as well as to the nature of the property at issue and its 'compatibility with expressive activity.'" *Id*. "A government may [] transform a publicly-owned property into a public forum by making it 'a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects.'" *Id*. When the Government designates a property as a public forum, it is not required to "indefinitely retain the open character of the facility," but so long as it does so, it is "bound by the same standards as apply in a traditional public forum." *Perry Educ. Ass'n*, 460 U.S. at 46.

When a publicly owned property is not a public forum by tradition or designation, the government has much greater discretion to restrict expressive activity. The government "may reserve [a nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*

To determine the nature of the forum at issue, courts look to the forum's physical characteristics and its historic and intended use. *United Church of Christ*, 383 F.3d at 453. Whether a given forum is considered a public forum, "hinges on a case-by-case inquiry in which no single factor is dispositive." *Id*.

Plaintiffs argue the Plaza is a traditional public forum where restrictions on speech are subject to strict scrutiny based primarily on the physical characteristics of the Plaza and its use as

11

a public thoroughfare. Defendant argues that the physical characteristics are not dispositive and contends the Plaza is a nonpublic forum where reasonable restrictions on speech are permissible.

Concerning the physical characteristics of the Plaza, it is undisputed that the Plaza is bordered by the public sidewalk on two sides and that, when events are not being held, there is nothing to distinguish the Arena Plaza from the public sidewalk. (Pl. SOF ¶ 27). Both the sidewalk and the Plaza are paved in the same-colored concrete, and the individual tiles are all the same size and shape. (*Id*.). When events are not being held, there are no physical barriers or anything else to separate the Plaza from the sidewalk, and pedestrians traversing the area walk on both the Plaza and the sidewalk without distinction. (*Id*.). When events are being held, as is the case at all times relevant to this lawsuit, the Plaza is delineated from the adjacent sidewalk with metal bicycle racks that serve as temporary barricades to delineate the Plaza from the public sidewalk. (Def. SOF ¶ 29). Plaintiffs argue that these physical characteristics and use of the Plaza as a public thoroughfare support a determination that the Plaza is, at all times, a traditional public forum, and that physically separating the Plaza from the public sidewalk with barriers during events does not transform it into a nonpublic forum. (Doc. No. 183 at 14).

Plaintiffs cite a long list of cases holding that streets and sidewalks are traditional public fora. (Doc. No. 183 (citing *United Church of Christ v. Gateway Economic Dev*., 383 F.3d 449 (6th Cir. 2004) (sidewalk surrounding the Gateway Sports Complex); *McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012) (sidewalks on university campus); *Brindley v. City of Memphis*, 934 F.3d 461, 469 (6th Cir. 2019) (privately owned street); *Grayned v. City of Rockford*, 408 U.S. 104 (1972) (sidewalk adjacent to high school); *Grace*, 461 U.S. at 180 (sidewalk adjacent to Supreme Court); *Boos v. Barry*, 485 U.S. 312 (1988) (sidewalk adjacent to embassy); *Frisby v.*

*Schultz*, 487 U.S. 474 (1988) (streets of a residential neighborhood); *McCullen v. Coakley*, 573 U.S. 464 (2014) (sidewalk near abortion facility)). These cases, while not entirely inapplicable, are distinguishable for the very straightforward reason that the Plaza, though it is adjacent to a sidewalk, is not, in fact, a sidewalk or a street.

Plaintiffs argue the Plaza is comparable to the sidewalk encircling the Gateway Sports Complex in Cleveland, which was held to be a traditional public forum. (Doc. No. 183 at 12 (citing *United Church of Christ v. Gateway Econ. Dev.*, 383 F.3d 449 (6th Cir. 2004) ("*Gateway*")). In *Gateway*, the court found the Gateway Sidewalk, which encircled the Gateway Sports Complex, but did not lead to its entry, was indistinguishable from the adjoining publicly owned sidewalk in physical appearance and intended use. 383 F.3d at 452. Although planter boxes roughly delineated the private sidewalk, the court found these were insufficient to alert the casual observer of the private nature of the sidewalk as compared to the indistinguishable public sidewalk. *Id*. ("[T]he average observer would be unfamiliar with the geographic significance of this sporadic vegetation.").

The Arena Plaza is distinguishable from the Gateway Sidewalk. First, it is not a sidewalk. While sidewalks may be a quintessential traditional public forum, a plaza that serves as an extension of and entrance to a commercial structure does not have the same status. *See Kokinda*, 497 U.S. 720 (1990); *Grace*, 461 U.S. at 177 (noting that public venues such as sidewalks have been "historically associated" with expressive activities and "are considered, without more, to be 'public forums'"). Second, unlike the Gateway Sidewalk, which was separated from the indistinguishable public sidewalk only by "sporadic vegetation," at all times at issue, the Plaza is

13

clearly demarcated with barriers leaving little doubt the distinction between the public and non-public areas.

Finally, the intended use of the Gateway Sidewalk was as a sidewalk – i.e., to serve as a public throughfare, which was no different from the use of the adjoining publicly owned sidewalk. But here, the purpose of the Arena is not to serve as a public thoroughfare, but to present "cultural, educational, entertainment, business, sporting, social and other public events." (*See* Def. SOF at ¶ 18; Management Agreement (2012), Doc. No. 179-1 at PageID# 2037, 2050). And the Plaza itself serves as an entrance to and extension of the Arena during events and provides space for commercial vendors associated with the event, security screening, and other event-related endeavors. (Def. SOF ¶¶ 20-22). In other words, a commercial purpose.

Moreover, although Plaintiffs are correct that traditional public fora are, like the Plaza, generally open to the public. But a nonpublic forum does not lose its private nature simple because the public is permitted to access the property when it is not being used for other purposes. Indeed, in *United States v. Kokinda*, 497 U.S. 720, 728 (1990), the Supreme Court held that the public sidewalk leading to a post office was not a public forum even though the sidewalk was open and accessible to the public. *See also*, *Greer v. Spock*, 424 U.S. 828 (1976) (holding that sidewalks within military base are a nonpublic forum even though the public was permitted free access to certain areas); *see also*, *Grace*, 461 U.S. at 178 (observing that even though the grounds of the Supreme Court were generally open to the public, they were "not transformed into 'public forum' property merely because the public [was] permitted to freely enter and leave the grounds at practically all times").

The Fifth Circuit decision in *Brister v. Faulkner*, 214 F.3d 675 (5th Cir. 2000), relied on by Plaintiffs, in which the court considered the forum status of a paved area connecting a public sidewalk with an event center, is more on point, but still distinguishable. In *Brister*, the court found a paved area front of a university event center a public forum, largely because of the lack of distinction between the sidewalk and the paved area. *Id*. at 682-83. The Court was concerned about a potential chilling effect on free speech because those wishing to speak would be "left to guess whether they have crossed some invisible line between a public and non-public forum."[11] *Id*. Unlike the paved area in *Brister*, the Plaza is clearly demarcated with barricades during events. Thus, there is no concern that the inability to distinguish the public and private fora will have a chilling effect on speech.

Defendant argues the Eight Circuit's decision in *Ball v. City of Lincoln*, which considered the forum status of the Pinnacle Bank Arena, a large sports and entertainment venue with an adjoining plaza, is more analogous than cases considering the forum status of sidewalks. (Doc. No. 178 at 18 (citing *Ball v. City of Lincoln*, 870 F.3d 722, 727 (8th Cir. 2017)). As in this case, the city entered into a management agreement with a private entity that promulgated a policy that restricted certain activities in the nonpublic areas of the arena, including an outdoor plaza. *Ball*, 870 F.3d at 727-28. Similar to the Arena Policies at issue here, the purpose of the use policy at issue in *Ball* was to "provide Arena patrons … safe and efficient access to the Arena and related facilities, as well as to allow the full use of the Arena by the performers, sports teams, trade shows, conventions, and others who leased the Arena for various events." *Id*. at 727-28. After he

---

[11] Notably, although the *Brister* court found the paved area was a public forum, it also held the university did not improperly remove persons distributing literature there because they were impeding the flow of traffic into the event center. *Brister v. Faulkner*, 214 F.3d 675, 683 (5th Cir. 2000) (finding these were reasonable time, place, and manner restrictions as applied).

15

was arrested for violating the leafletting prohibition, the *Ball* plaintiff filed suit challenging the policy as an unconstitutional restraint on his First Amendment right to free speech. *Id*. at 728. After carefully examining the plaza's physical characteristics, use, and government intent, purpose, and policy, the court concluded that the plaza outside the Pinnacle Bank Arena was a nonpublic forum. *Id*. at 731-36.

Plaintiff argues that the plaza in *Ball* had more distinctive physical characteristics than the Arena Plaza. (Doc. No. 183 at 19). The *Ball* plaza had "special characteristics" that distinguished it from the adjacent public sidewalks, including curved irregular borders that were identified by conspicuous markers such as cement planters, bollards, and flagpoles, and a different surface than that of the public sidewalks. *Ball*, 870 F.3d at 732-33. The court found that "[t]hese physical features, coupled with the general size, unique shape, and overall appearance of the Plaza Area, serve[d] to distinguish it from the adjacent public sidewalks." *Id*. at 733.

After observing that the "mere physical characteristics of the property cannot dictate forum analysis," the *Ball* court also considered the use and purpose of the plaza. *Id*. (citing *Kokinda*, 497 U.S. at 727). Similar to the Arena Plaza, the plaza in *Ball* was used as "a venue for commercial use by Arena Tenants, as a means to facilitate safe and orderly access to the Arena for its patrons, as a security screening area, and as a gathering place and entryway for Arena patrons" and had consistently been used as intended [for] commercial purposes associated with events occurring inside the Arena." *Id*. at 734-35. The *Ball* court rejected the plaintiff's argument that the plaza's use by members of the public en route to other destinations resulted in public forum status. *Id*.

16

The Plaza here is more analogous to the plaza at issue in *Ball*, than the Gateway sidewalk in *United Church of Christ*. Like the plaza in *Ball*, the Arena Plaza has a commercial purpose and historic use. It does not function primarily as a sidewalk or thoroughfare like the Gateway sidewalk (or any other sidewalk). And, at relevant times, the Plaza is delineated from the public sidewalk with temporary barriers.

Plaintiffs argue the presence of the temporary barriers cannot serve to transform the Plaza from a public to a nonpublic venue. But no transformation takes place. Rather the venue is always a nonpublic venue, the temporary barriers simply serve to provide a visual physical delineation between the nonpublic Plaza area and the public sidewalk during events – i.e., when Plaza is being used for its primary purpose. The record indicates that Plaintiffs have only attempted to engage in religious speech when events are being held and the barricades are in place. Therefore, they cannot plausibly contend that the temporary nature of the barricades has a chilling effect on their constitutionally protected speech. Moreover, even if the precise contours of the Plaza are indiscernible when the barricades are not present, no reasonable person would perceive the entirety of the Plaza as a sidewalk.

Nor is this, as Plaintiffs argue, a case where the city has *ipse dixit* destroyed the public forum status of a historical public forum such as a sidewalk, street, or park. (*See* Doc. No. 183 at 15 (citing *Grace*, 461 U.S. at 175 (the government may not "transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property")). Unlike the sidewalk at issue in *Grace*, the Plaza is not quintessential traditional public forum and it has not been transformed into a

17

nonpublic forum *ipse dixit*. Rather, the Plaza's status as a nonpublic forum is based on its intended and historic use and physical characteristics.[12]

Overall, considering the Plaza's physical characteristics, purpose, and historic use, the Court concludes that the Arena Plaza is a nonpublic forum.

2.  Reasonableness

For a nonpublic forum, the government may limit access "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir. 2007) (internal quotation marks omitted). A restriction on expressive activity in a nonpublic forum "need only be reasonable; it need not be the most reasonable or the only reasonable limitation" to be constitutionally permissible. *Kokinda*, 497 U.S. at 730.

a.  Amplification

Metro argues the ban on amplification is reasonable because "[t]he Arena makes important announcements, directs crowd traffic, and provides verbal instructions to patrons in the Plaza in connection with events, and the use of voice amplification devices by others clearly hinders that ability." (Doc. No. 178 at 24). Plaintiffs argue this is insufficient to show that the amplification ban is reasonable because Metro has not provided any evidence to show that amplified sound would hinder its ability to make announcements or that Peters' use of amplification actually hindered the event. (Doc. No. 183 at 27). Peters contends the messages

---

[12]    At most, the Plaza is a designated public forum, which is only open to the public for traditional expressive activities when the Area is not being used for events. See *Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 45 (1983) (noting that the state is not required to "indefinitely retain the open character" of a designated public forum).

18

given on Arena loudspeakers could still be heard. (*Id*. (citing Peters Decl., Doc. No. 185-1, ¶ 10)).

The Court finds the amplification ban reasonable given the established use of the Plaza. Defendant has shown that the Arena makes important announcements, directs crowd traffic, and provides verbal instructions to patrons in the Plaza in connection with events and the use of voice amplification devices by other hinders this ability. Moreover, the Arena Policies, including the amplification ban, protect the contractual rights of those leasing the Arena facilities. (*See* Def. SOF ¶¶ 19-22). Accordingly, Plaintiffs' challenge to the Arena Policy banning amplification fails.

b. <u>Leafletting</u>

The Arena Policies generally prohibit distribution of flyers, pamphlets, leaflets, and brochures "without the express written consent from [the] Arena." (Def. SOF ¶ 23). The decision whether to grant or deny requests to distribute written materials during an event is based upon whether the requesting party has a connection to the event and whether the requesting party has paid or offered some other consideration for its use of the Arena and/or the Plaza in connection with the event. (*Id*. ¶ 25). When a written request to distribute materials is made based on the requestor's connection with an event, decisions on the written request are promptly made. If the applicant has a demonstrable connection to the Team, Arena tenant(s) or licensee(s), event promoter(s), and/or their affiliates, then the request will be approved unless one of the foregoing parties objects. (*Id*. ¶ 26).  Defendant states this leafletting restriction is necessary to protect and enhance the ability of the Team and Powers to enter into full contracts with various promoters,

19

artists, and vendors, as well as to prevent interference with the contractual uses of the Arena and Plaza. (Def. SOF ¶ 24 (citing Powers Decl., Doc. No. 179-5, ¶ 11)).

The parties agree that Peters and Winslow assert a facial challenge to the Arena Policy on distribution of literature. Winslow, who claims to have been asked to leave the Plaza while distributing literature, does not bring an as-applied challenge to the Policy, but Peters claims to do so on behalf of his "associates." Because Peters does not claim that he was personally asked to cease distribution of literature or leave the Plaza because of these activities, he cannot bring an as-applied challenge to the Policy. Accordingly, the Court considers Plaintiffs' challenge to the Arena Policy on distribution of literature on its face.

The vast majority of Plaintiffs' arguments concerning the constitutionality of the leafletting restriction are based on the assumption that the Plaza is a public forum, which, for the reasons stated above, is incorrect. In a nonpublic forum, the government may limit access "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir. 2007). Decisions whether to allow leafletting are made based on the applicant's relationship to the event. If there is a connection to the event, the application is generally approved unless the event holder objects. This policy is viewpoint neutral, and Plaintiffs do not argue otherwise.

The policy is also reasonable in light of the commercial purposes of the Arena and Plaza. Plaintiffs argue that the restrictions are unreasonable because they constitute a "total ban on all literature distribution" and there is no evidence that Plaintiffs' distribution of literature interferes with the events. (Doc. No. 183 at 25). But the leafletting restriction is not a "total ban on all

literature distribution," and it is reasonable for the Arena to limit literature distribution to those associated with events. Because the Arena Policy on leafletting is viewpoint neutral and reasonable, Plaintiffs' facial challenge to the regulation fails.

### C. June 6, 2018

Plaintiffs point to one alleged constitutional violation that involved their exclusion from an undisputably traditional public forum – the public sidewalk – on June 6, 2018. On that date, the Arena was hosting the CMT Awards show. (Def. SOF. ¶ 68). CMT Awards organizers had obtained a street closure permit from the city to partially close Fifth Avenue between Demonbruen and Broadway, a section of Fifth Avenue that runs along one side of the Arena and boarders the Plaza. (*Id*. ¶ 70). On that date Peters and Winslow were told by an unidentified person that they could not preach on the sidewalk area between the barricades set up on the Plaza and Fifth Avenue. (Pl. SOF ¶ 20; Def. SOF ¶¶ 72, 73). They were later told by a police officer that they had to leave both the Plaza and the sidewalk. (Pl. SOF ¶ 20 (citing Peters. Decl., Doc. No. 185-1, ¶ 22; Winslow Decl. ¶ 13; Peters Dep. at 132, 135, 142, 144)). The parties appear to agree that the police officer who told them they could not preach on the sidewalk was not employed by MNPD. (Def. SOF ¶¶ 74-76).

At this juncture, we must return to the crux of municipal liability. As explained above, in order to sustain a constitutional claim against a municipality or local government, a plaintiff must prove, "that the municipality's policy or custom caused the violation to happen." *Bright*, 753 F.3d at 660. The plaintiff must "identify the policy, connect the policy to the [municipality] itself and show the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

21

Plaintiffs acknowledge that the police officer who told them they could not preach on the public sidewalk was not employed by MNPD, but argue that Metro is nevertheless responsible for his conduct because: (1) Metro and/or Powers delegated its responsibility over public property to the officer; and (2) the officer was enforcing Arena Policies.[13] (Doc. No. 183 at 28). Plaintiffs argue that "in this way, these individuals were acting as agents of Metro, and Metro is responsible for their actions." (*Id*.).

Plaintiffs does not point to any evidence in support of these assertions. In contrast, Defendant has provided evidence that MNPD does not enforce the Arena Policies (Def. SOF, ¶ 41-46 (stating that MNPD officers do not "enforce the [Arena's] 'House Rules' proactively" and explaining the agreed protocol for addressing violations of Arena Policies)). And even if MNPD or others designated by Powers did enforce the Arena Policies, there is nothing in the Arena Policies, which apply specifically to the Arena and Plaza, that would prohibit Plaintiffs from preaching on the public sidewalk. In other words, when the officer told Plaintiffs that they could not preach on the public sidewalk, it was not pursuant to the Arena Policies. Nor is there any evidence that this action was pursuant to any direction by Metro or Powers or attributable to a municipal policy or custom of Metro. Therefore, summary judgment will be granted in favor of Metro on Plaintiffs' claim arising out the actions by the unnamed officer on June 6, 2018.

### D. Due Process

"A law is overbroad under the First Amendment if it 'reaches a substantial number of impermissible applications' relative to the law's legitimate sweep." *New York v. Ferber*, 458

---

[13]     Of course, because municipal liability cannot be based on respondeat superior, whether the officer was employer by Metro is beside the point. *See Monell v. N.Y.C. Dept. of Social Servs*., 436 U.S. 658, 691 (1978) (holding that municipalities and local governments "cannot be held liable under § 1983 on a respondeat superior theory").

U.S. 747, 771 (1982). Defendant contends Plaintiffs' claims that the leafletting restriction and amplification ban are overbroad is without merit because "the policies neither implicate nor proscribe a substantial amount of constitutionally protected conduct." Plaintiffs respond that "the outright bans on amplification and literature distribution are overbroad" and argues that Metro has not shown the alternative channels of communication are adequate.

Plaintiffs' argument appears to again be based on the assumption that the Plaza is a public forum, which it is not. In any event, Plaintiffs have entirely failed to develop any argument that the policies at issue proscribe any constitutionally protected conduct, let alone a substantial amount. A party may not present a skeletal argument, leaving the court to put flesh on its bones. *United States v. Hendrickson*, 822 F.3d 812, 829 n.10 (6th Cir. 2016). In instances such as this, where "[i]ssues [are] adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," the issue is considered forfeited. *Buetenmiller v. Macomb Cty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Defendant's motion for summary judgment of Plaintiffs' due process claim is effectively unopposed. Accordingly, summary judgment will be granted in favor of Defendant on the due process claim.

### III.       CONCLUSION

For the reasons stated herein, Defendant's motion for summary judgment (Doc. No. 177) will be **GRANTED** as to all claims.

An appropriate Order will enter.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE